822 F.2d 676
 MULAY PLASTICS, INC., Plaintiff-Appellant,
v.
GRAND TRUNK WESTERN RAILROAD COMPANY, Dobson Heavy Haul,
Inc., and Prestolite Company, Defendants-Appellees.
GRAND TRUNK WESTERN RAILROAD COMPANY, Cross-Appellant,
v.
MULAY PLASTICS, INC., Cross-Appellee.
 Nos. 86-1936, 86-2023.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 25, 1987.
Decided June 11, 1987.
 
 Francis X. Grossi, Jr., Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for plaintiff-appellant.
 James A. Romanyak, Romanyak & Miller, Donald G. Peterson, Schaffenegger, Watson & Peterson, Richard G. French, French, Rogers, Kezelis & Kominiarek, P.C., Chicago, Ill., for defendants-appellees.
 Before CUMMINGS and WOOD, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 Mulay's injection molding machine suffered damage from undetermined causes while being shipped. Mulay sued the shipper, the rigger, and the carrier under the common law; the Uniform Commercial Code, Ill.Rev.Stat., Ch. 26 Sec. 2-509; and the Carmack Amendment, now 49 U.S.C. Sec. 11707. The jury found for defendants. Mulay contended that the jury's verdict was not supported by the evidence and was inherently contradictory. The trial judge declined to grant a new trial or judgment notwithstanding the verdict and Mulay appeals. Grand Trunk cross-appeals from the order of the district court awarding attorney's fees to Mulay as a procedural sanction. We will affirm.
 
 
 2
 * Mulay purchased a massive piece of machinery, a used injection molding machine, from Prestolite in February of 1981. Prestolite had used the machine for eleven years and sold it to Mulay "as-is." The injection molding machine consisted of an injection end, a clamp end, and a base.[1] The clamp end and base were shipped as a single unit (the "machine") from Prestolite's plant in Bay City, Michigan, to Mulay's in Addison, Illinois. Together, the clamp end and base are twenty-seven feet long and fifteen feet high and weigh about seventy-five tons. The clamp end itself, which rests on the base, weighs fifty tons. Mulay hired Dobson to move the machine from the Prestolite plant to a Grand Trunk railway siding and to load it on a Grand Trunk flatcar.
 
 
 3
 Mulay took no part in transporting the machine, leaving the disassembly, loading, rigging, and carriage to the defendants. Dobson brought the machine by truck from Prestolite's plant to Grand Trunk's siding and loaded it by crane onto the flatcar. Dobson blocked and bolted the base of the machine to the flatcar but did not block the clamp end, leaving it simply in its position atop the base. Thus, the six one-inch steel bolts and two one and one-quarter inch steel sleeve dowels which held the clamp end in place during operation were the only things holding the clamp end in place during shipment besides gravity and friction. The bolts guarded against vertical movement and the dowels against horizontal. The bolts and dowels can only be seen if a sheet metal cover is removed from the sides of the machine.
 
 
 4
 Grand Trunk's car man saw the machine four times. He took rough measurements of it in Prestolite's plant. He made a general inspection after it was loaded on the flatcar. Dobson's rigging foreman told him then how the machine would be secured and told him that there were parts above the base. He inspected it after rigging was finished and again before it left the siding. He approved the machine for transport as rigged.
 
 
 5
 Grand Trunk then transported it as far as Markham, Illinois. The machine was twice weighed underway at weigh stations of the Illinois Central Gulf Railroad Company. Illinois Central both times issued a weigh bill with instructions not to exceed thirty miles per hour, because the machine exceeded Illinois Central weight requirements for that type of load, flatcar and track. Signs were put on the flatcar with the legend, "Do Not Hump." "Humping" means coupling railway cars at speeds greater than four miles per hour.
 
 
 6
 In Markham, the unit was found to be severely damaged. The clamp end had come loose and moved almost six feet, damaging the machine in various ways. No one ever determined when the clamp end had moved. The bolts had been cut in half by the clamp end's movement. One witness testified that the dowels were found intact at the bottom of the flatcar. Another testified that the dowels were sheared.
 
 
 7
 Mulay brought suit against Prestolite, Dobson, and Grand Trunk, alleging that each was negligent. As to each defendant, Mulay sought to prove negligence both through specific acts and omissions and by the application of res ipsa loquitur.
 
 
 8
 Mulay also had a non-negligence theory of liability against each defendant. Mulay alleged breach of contract by Dobson, a claim that Mulay does not pursue on appeal. Mulay sought recovery from Prestolite under Illinois statutory law for failing to "duly deliver" the machine as required by the Uniform Commercial Code, Sec. 2-509(1)(a). Against Grand Trunk Mulay included a count under the Carmack Amendment, 49 U.S.C. Sec. 11707, which makes a carrier liable under federal law for damage caused to cargo unless he can establish one of several defenses; the one defense relevant here would be a showing that Grand Trunk was not negligent and that the damage to the machine was a result of the "inherent nature or vice" of the machine.
 
 
 9
 Grand Trunk brought a counterclaim against Mulay for the shipping bill, which Mulay had declined to pay.
 
 
 10
 The trial court granted summary judgment for Mulay against Grand Trunk on the Carmack Amendment count but subsequently vacated the judgment on the basis of new deposition testimony. Because of Grand Trunk's delay in presenting the new testimony, the court awarded attorney's fees to Mulay. The court also denied a motion by Dobson to amend its answer to include the affirmative defense of comparative negligence and barred the introduction of evidence of Mulay's comparative negligence at trial.
 
 
 11
 The witnesses at trial forwarded several theories to explain the damage. Some opined that a sudden large force caused by excessive speed or humping or another type of impact caused the clamp end to shift. Another believed that the dowels had become loose while the machine was used at Prestolite and had at some point fallen out, leaving nothing to hold the clamp end in place during transport but the bolts, which would not stop it from shifting horizontally.
 
 
 12
 After trial, the jury found for defendants on every claim and on the Grand Trunk counterclaim for shipping charges. The trial court denied Mulay's motion for judgment notwithstanding the verdict or for a new trial. Mulay appeals from that ruling and Grand Trunk cross-appeals the granting of attorney's fees.
 
 II
 
 13
 There are claims in this case based on federal jurisdiction and on diversity jurisdiction. The federal standard of review on appeal of a ruling on a motion for judgment notwithstanding the verdict is the same as the standard the district court applies in considering the motion, whether there is substantial evidence to support the verdict. LaMontagne v. American Convenience Products, Inc., 750 F.2d 1405, 1410 (7th Cir.1984). Illinois[2] allows judgments n.o.v. "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria and Eastern Railroad Company, 37 Ill.2d 494, 229 N.E.2d 504, 513-14 (1967). The motions for a new trial are based on a claim that the jury delivered inconsistent verdicts; the rule is the same in both federal and Illinois courts that inconsistent verdicts require a new trial. Bates v. Jean, 745 F.2d 1146, 1152 (7th Cir.1984). Hinnen v. Burnett, 144 Ill.App.3d 1038, 99 Ill.Dec. 76, 81-82, 495 N.E.2d 141, 146-47 (5th Dist.1986).
 
 
 14
 We first address Mulay's contention that the damage was necessarily proximately caused by negligence on the part of at least one of the defendants. Simply stated, we believe that the jury could have found that the damage would have occurred even if none of the defendants was negligent. Mulay alleges that various shortcomings constituted negligence: failure by all defendants to inspect the dowels and by Prestolite to secure the dowels; failure by Dobson to block the clamp end and to call the manufacturer, NATCO, for instructions about how to rig the machine for rail transport; failure by Grand Trunk in allowing the machine to be shipped so rigged; negligent application of excessive force to the machine during shipping by Grand Trunk by "humping" or by transport at excessive speed.
 
 
 15
 Mulay did not establish that the dowels were missing or loose when they left Prestolite. A service manager for NATCO, the manufacturer of the machine, testified that the dowels may have become loose and fallen out while the machine was still at Prestolite. Another conclusion could be that the dowels, although apparently in order, worked their way loose underway. The witness gave no reason why that was less likely. It was not established that inspecting the dowels would have disclosed such a problem and prevented it. Thus, even if failure to inspect the dowels was negligent, it was not established to be a cause of the damage.
 
 
 16
 The NATCO service manager's testimony also gave the jury a basis for concluding that the damage would have occurred even if the alleged acts of negligence had not occurred, that is, even if the flatcar began its trip with the dowels securely in place and the clamp end rigged as the manufacturer itself rigged it for transportation. He testified that similar damage had occurred to similar machines when they were transported by rail even though it was NATCO's practice to secure the clamp end with cables.[3] He made no mention of any problem of dowel slippage in those cases. Because of this "problem of losing the units," NATCO has changed the way in which it ships the machines. NATCO made this change after the time of the incident in this case. It now ships the base separately from the clamp end. This, together with the description of the machine, was a basis for the jury to conclude that the design and manufacture of the machine was such that the damage in the present case was of the sort that could occur without negligence and be caused by the nature of the machine itself. This conclusion would draw further support from the opinion of Dobson's rigging supervisor that the damage would have occurred even if the clamp end had been secured by cables and of a Mulay employee that Dobson's bracing was adequate.
 
 
 17
 The jury could thus have concluded that the acts of which Mulay complains were not the proximate cause of the damage. Because it affects the analysis below, we also discuss whether the jury could have further concluded also that Grand Trunk was not negligent, that its employees had acted as reasonable persons under the circumstances. The machine was loaded and blocked in place by professional riggers. The top half of the machine was not blocked in place. But a reasonable person might not have thought that necessary from the aspect of the machine. The two dowels and six bolts, which held the clamp end to the base, were visible only if a sheet metal cover was removed. Grand Trunk employees testified that the machine appeared to be "one solid machine," "one big piece of machinery," "tank-like." Dobson's rigging foreman did advise Grand Trunk's car man that "there were parts of the machine above the base." That is not a warning that over half the machine might shift on the base when the flatcar was moved. The fact that Dobson itself had not seen fit to secure the top would in fact imply the opposite. Furthermore, the evidence supported a conclusion that blocking the clamp end was not necessary if the dowels were in place. The NATCO service manager testified that in his opinion the load in this case would have withstood a thirty mile per hour impact if the dowels had been in place. From this evidence, the jury could have found that Grand Trunk was not negligent.
 
 
 18
 Mulay based its allegations of Grand Trunk's negligence also on opinion testimony that the damage must have been caused by a sudden large impact on the load during Grand Trunk's shipment. The witnesses based this opinion not on direct evidence that Grand Trunk had carried the load at excessive speeds or "humped" the flatcar but on the nature of the damage. None of the witnesses was an expert in physics or in rail collisions. The jury was entitled to reject their opinions in light of the other plausible explanations.
 
 
 19
 Mulay also sought to prove negligence by invoking the doctrine of res ipsa loquitur. Application of that doctrine can raise an inference of negligence where other causes are rendered unlikely. Where a mouse is found in a coke bottle or a scalpel in a stomach, the inference of negligence may be so strong that the jury cannot reject it; but the jury is free to reject the inference when there is conflicting evidence. Imig v. Beck, 503 N.E.2d 324, 104 Ill.Dec. 767, 115 Ill.2d 18 (1986). Mulay argues that the jury's verdict on the res ipsa count as instructed in this case presents an inherent conflict. We have recently reaffirmed the principle that juries must return consistent verdicts. Rose v. Hearst Magazines Division, The Hearst Corporation, 814 F.2d 491 (7th Cir.1987). The trial court here instructed the jury as follows:
 
 
 20
 In Count VI, Mulay has the burden of proving each of the two propositions:
 
 
 21
 1. In the normal course of business, the machine would not have been damaged in the absence of negligence of one or more of the defendants;
 
 
 22
 2. After the purchase, the machine was under the control or management of each of the defendants.
 
 
 23
 If you find that Mulay has proved each of those propositions then each of the defendants is presumed to have been a proximate cause of Mulay's injury and your verdict on Count VI has to be for Mulay.
 
 
 24
 If you find for Mulay on that count, each defendant is jointly liable for the total amount of damages sustained by Mulay unless that defendant rebuts the presumption of itself having been a proximate cause, as I'll explain in just a second.
 
 
 25
 On the other hand, of course, if you find that any one of the propositions hasn't been proved, then your verdict on Count VI should be for all the defendants.
 
 
 26
 Now, the presumption that each defendant was a proximate cause of Mulay's injuries can be rebutted by any of the defendants (for that purpose each defendant has its own burden of proving that Mulay's losses were caused by one or more of the other defendants).
 
 
 27
 Only if you find that a particular defendant has met that burden and is free from fault, may your verdict be in favor of that defendant on Count VI.
 
 
 28
 At trial, each of the defendants argued that the damage was the fault of one or more of the other defendants. There was evidence to support the arguments. Mulay thus argues that a presumption of negligence was raised as to each defendant that could be rebutted only by proof that another defendant's negligence was the cause of the damage. Thus, at least one defendant must be liable.
 
 
 29
 But the fact that each defendant argued that the others were negligent does not amount to an admission by the defendants that one of them was negligent. No defendant admitted that it was negligent itself, and no defendant is entitled to make admissions of negligence on behalf of the other defendants. As discussed above, the jury could have found that the damage was not caused by negligence on the part of any of the defendants; the jury could thus have rejected the application of res ipsa under the instruction.
 
 III
 
 30
 Mulay also contends that the jury rendered inconsistent special verdicts on two other counts and that this requires a new trial. The court instructed the jury on the Carmack amendment count as follows:Mulay has the burden of proving each of two propositions as to Grand Trunk. First, that the machine was delivered to Grand Trunk in undamaged condition. And, second, that the machine was later delivered to Mulay in a damaged condition.
 
 
 31
 In this case Grand Trunk has asserted two affirmative defenses to Mulay's claim of that nature. First, that Grand Trunk was free of negligence in its own handling of the machine. And, second, that the damage was caused by a latent or hidden defect in the machine. Grand Trunk has the burden of proving its affirmative defenses.
 
 
 32
 The court instructed the jury on the count against Prestolite under the UCC as follows:
 
 
 33
 [The UCC] imposes on a shipper, in this case Prestolite, the duty "to duly deliver goods to a designated carrier." In this case Grand Trunk. In other words, the shipper has to deliver goods to the carrier free from defects.
 
 
 34
 If the shipper breaches that duty it remains liable for any injury that's proximately caused by the defect. Mulay has the burden of proving that Prestolite did not deliver the machine to Grand Trunk and Dobson free of defects.
 
 
 35
 The jury found for Grand Trunk on the Carmack Amendment count and for Prestolite on the UCC count. Mulay argues as follows: The parties agree that the machine was delivered to Grand Trunk undamaged and became damaged en route. Therefore, the jury must have found that Grand Trunk proved its affirmative defense, which required finding that the damage was caused by a "latent or hidden defect in the machine." Thus, the machine was delivered to Grand Trunk with a latent defect. But on the UCC count, the jury must have found that Prestolite delivered the machine free from defects. The two findings are contradictory.
 
 
 36
 Setting aside for a moment the wording of the instructions, we note first that a verdict for Grand Trunk on the Carmack Amendment count and a verdict for Prestolite on the UCC count are not inconsistent under the law. Grand Trunk establishes its defense if it proves that the damage was caused by an "inherent vice" of the machine. Prestolite wins unless Mulay shows that Prestolite did not "duly deliver" the machine. To say that verdicts for each defendant are inconsistent would be to say that the shipper's duty to "duly deliver" the goods includes the duty to ensure that the goods will not suffer damage as a result of an "inherent vice." Particularly here, where the machine was sold as-is, that would require more of the shipper than the UCC intends. Whenever goods suffer damage because of an inherent vice, the shipper would be liable, even where he sold the goods "as-is."
 
 
 37
 The shipper's duty to "duly deliver" the goods comes from UCC Sec. 2-509(1)(a): in a contract, such as the one in the present case, where the risk of loss during transport is on the buyer, "[t]he risk of loss passes to the buyer when the goods are duly delivered to the carrier." The "duly deliver" requirement thus does not set a standard for the quality of the goods independent of the other warranty provisions of the Code. Rather, it reflects only the rule that the risk of loss should not pass to the buyer until the shipper has reasonably performed certain duties under the contract. "If for example, the seller loads them improperly or if he makes a contract which is not proper under 2-504(a) [Sec. 2-504 is not at issue here], he does not duly deliver." White and Summers, Uniform Commercial Code (2d ed.), Sec. 5-2 (1980).
 
 
 38
 Prestolite had performed the little that was required of it to ship the goods, which was to open a wall at its plant so Dobson could remove the machine. As discussed above, the jury was entitled to find that the damage was not a result of negligence on the part of Prestolite, that the dowels had been in securely in place when the machine left Prestolite.
 
 
 39
 At least where, as here, a nonmerchant shipper sells the goods "as-is", thus disavowing liability for hidden faults in the goods, the risk that they will suffer damage as a result of a latent, inherent vice is one that belongs with the risk of loss of the shipment. Mulay bought the machine "as-is", arranged for the rigging and shipping of the machine, knew how the machine would be shipped, and accepted the risk of loss during shipment. Prestolite would not have been liable if the machine had broken down the first time that Mulay used it. We will not hold that Prestolite did not "duly deliver" the machine and thus that the risk of loss did not pass to Mulay because Prestolite did not inspect the dowels where, as discussed below, the jury could find that inspecting the dowels or even blocking the clamp end would not have prevented the damage.
 
 
 40
 We turn to Grand Trunk. The Carmack Amendment[4] absolves the carrier from liability when it can show both that it was not negligent and that the damage resulted from an inherent vice of the goods. The jury was entitled to find that Grand Trunk was not negligent, as discussed above.
 
 
 41
 As to the second prong of Grand Trunk's defense, in some cases it is clear what damage from an inherent vice of goods means. Foods rot; iron rusts; some wines simply do not travel well. Where the carrier is not negligent in handling such goods, he is not held liable for the rot, rust or deterioration. An inherent vice, then, could be understood to mean a quality of the goods that causes damage to the goods during transport even in the absence of negligence. There was evidence that such a quality was present in this case, as discussed above. Although the machine appeared solid and was normally securely held together by dowels, the dowels had a tendency to slip out during rail transport and permit the clamp end to shift on the base.
 
 
 42
 Returning to the discussion of the question whether the jury's verdicts were inconsistent under the particular instructions in this case, the reason for the tension is that the instructions use the word "defect" to refer both to an inherent vice of the goods for Carmack Amendment purposes and to a failure of the shipper to duly deliver the goods for UCC purposes and thus hazard conflating two distinct concepts. Under the instructions, an inherent vice is a "latent or hidden defect;" goods that are not only delivered have a "defect." The jury found the machine to have the former but not the latter.
 
 
 43
 We reconcile the two findings by holding that the jury was entitled to find that where the goods had a "latent or hidden defect" for the purposes of the Carmack Amendment count, they did not necessarily have a "defect" for the purposes of the UCC count. In other words, the jurors could have decided that the tendency of the dowels to slip loose and permit the clamp end to shift was a "latent defect" for which the carrier was not responsible, but at the same time that condition was not a "defect" the presence of which meant that the shipper did not duly deliver the goods. The word defect would not be given the same meaning in the two instructions. That is not illogical; indeed, the word must be given different meanings in order to interpret the instructions accurately to reflect the law. This is a strained reading of the instructions, but a correct one. Such an understanding of the instructions is consistent with the law underlying the instructions and with the evidence in the case. As the trial judge put it, "You cannot, in Gertrude Stein terms, say, 'A defect is a defect is a defect.' "
 
 IV
 
 44
 Grand Trunk cross-appeals the district court's conditional award of $3,820.70 in attorney's fees to Mulay for Grand Trunk's tardy failure to produce evidence in opposition to Mulay's summary judgment motion.
 
 
 45
 Mulay moved for summary judgment against Grand Trunk on the Carmack Amendment count on July 22, 1983, about eight months after the complaint was filed. Grand Trunk filed a reply and sur-reply. The court granted summary judgment to Mulay on September 30, 1983.
 
 
 46
 Grand Trunk moved to vacate the summary judgment on February 17, 1984, relying principally on the deposition of NATCO's service manager, which was taken after the grant of summary judgment. In the deposition, the NATCO service manager testified that the locator dowels may have been missing from the machine when it entered Grand Trunk's control; this information provided the basis of a defense against Carmack Amendment liability.
 
 
 47
 The trial court concluded that Grand Trunk had breached "an affirmative duty to file material in opposing ... summary judgment," justifying denial of reconsideration. Mulay Plastics, Inc. v. Grand Trunk Western Railroad Co., 102 F.R.D. 130, 131-32 (N.D.Ill.) (quoting O'Byrne v. Cheker Oil Co., 727 F.2d 159, 167 (7th Cir.1984)), app. dism'd, 742 F.2d 369 (7th Cir.1984), cert. denied, 470 U.S. 1037, 105 S.Ct. 1409, 84 L.Ed.2d 798 (1985). The court held that Grand Trunk had unreasonably, if not deliberately, failed to advance the defense earlier. Grand Trunk had notice of the basis of the defense prior even to the filing of the complaint because the NATCO service manager had suggested to Grand Trunk's damage prevention officer that the dowels might be missing and searched for the dowels with him.
 
 
 48
 But because Grand Trunk's lapse was not willful, the court did not apply the harsh sanction of refusing reconsideration. The court, invoking its equitable powers, decided for "striking a middle ground" and vacated the ruling conditioned on Grand Trunk's payment of Mulay's attorney's fees in handling the motion. The court drew an analogy to Rule 60, which permits relief from a final judgment to be granted "upon such terms as are just." The court also likened its ruling to granting voluntary dismissal under Rule 41(a)(2) upon "such terms and conditions as the court deems proper." The court drew its authority from the statement in Hall v. Cole, 412 U.S. 1, 4-5, 93 S.Ct. 1943, 1945-46, 36 L.Ed.2d 702 (1973), that "federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require."
 
 
 49
 The trial court could have denied reconsideration of the order granting summary judgment. Grand Trunk also had the option of not paying the fees and letting the judgment stand, an option that it understandably did not find attractive. Thus, the granting of fees here actually benefited Grand Trunk. Having so benefited below, Grand Trunk cannot further improve its position here.
 
 V
 
 50
 For the reasons stated above, the judgment of the district court is
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 The witnesses's testimony conflicted in various ways, not all of which were material. Their terminology varied; what this opinion refers to as the clamp end was also termed the "platen," the "hydraulic portion end," and the "clamp assembly." The witnesses varied in their understanding of the railroad term, "humping." Even the numbers of dowels and bolts were not the subject of agreement. Where the differences are material, we view the evidence in the light most favorable to the defendants. Where the differences are simply verbal, we use the simplest approach
 
 
 [2]
 The parties have all proceeded on the assumption that the applicable state law is that of Illinois
 
 
 [3]
 NATCO did not always secure the clamp end when shipping injection molding machines by rail. When Dobson unloaded the machine that later became the subject of this case on its arrival at Prestolite's plant in 1969, the clamp end was not secured separately from the base. Dobson thus rigged the machine the same way that it had arrived from the manufacturer
 
 
 [4]
 We note that one district court in this circuit has held that the Carmack Amendment preempts state common law claims against carriers for damage to interstate shipments. Wirth, Ltd. v. Silvretta, 575 F.Supp. 1274, 1276 (N.D.Ill.1984). The courts of appeals that have addressed this question have split. See cases collected in Wirth. This case does not present that question for us to decide