862 F.2d 119
 26 Fed. R. Evid. Serv. 1338
 Elizabeth Jeanne CULLI and Gary Leonard Culli, Plaintiffs-Appellees,
v.
MARATHON PETROLEUM COMPANY, an Ohio corporation, d/b/a
Cheker Oil Co.; and Cheker Oil/Western Division,
a division of EMRO Marketing Company, a
Delaware corporation,
Defendants-Appellants.
 No. 88-1046.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 24, 1988.
Decided Nov. 9, 1988.
 
 1
 Demetri Hassakis, Hassakis & Hassakis, Vernon, Ill., for plaintiffs-appellees.
 
 
 2
 Gene J. Brockland, Caruthers Herzog Crebs & McGhee, St. Louis, Mo., for defendants-appellants.
 
 
 3
 Before POSNER and COFFEY, Circuit Judges, and WILL, Senior District Judge.*
 
 
 4
 WILL, Senior District Judge.
 
 
 5
 This is a slip and fall negligence case with federal jurisdiction based on diversity.[1] Elizabeth and Gary Culli, plaintiffs-appellees, brought an action against the owners and operators of a gas station, Marathon Petroleum Company and Cheker Oil/Western Division, defendants-appellants, based on Mrs. Culli's physical injuries suffered as a result of her fall at the defendants' station and Mr. Culli's loss of consortium. The jury returned a verdict in favor of the plaintiffs and against both defendants, awarding $90,500.00.[2] The defendants' motions for judgment notwithstanding the verdict and a new trial were denied. The defendants appeal the denial of their motions but not the amount of the jury award. We affirm.
 
 BACKGROUND
 
 6
 Marathon and Cheker owned and operated a twenty-four hour self-service gas station at the corner of Broadway and 22nd Street in Mt. Vernon, Illinois. The station was typically staffed by one person, an attendant, who would primarily stay inside running the cash register. The manager was generally present during some morning hours, sometimes by himself. Two attendants would usually be at the station together for a brief period, approximately thirty minutes, when one came to work to replace the other. In addition to operating the cash register, the attendant was responsible for replenishing supplies and maintaining the premises. At the station, the defendants sold gas, oil, transmission fluid, cigarettes, milk, hot food, sandwiches, candy, soda, clothing and other things. Testimony at trial established that the attendants' priorities were to receive payments from customers, replenish inventory, maintain the inside of the store and, finally, maintain the outside area.
 
 
 7
 Mrs. Culli's accident occurred on Saturday, August 4, 1984, a day on which the station was conducting a special soda sale. The station has three sets of islands which house gas pumps and soda cartons were stacked on pallets at the ends of the pump islands. Soda sales on August 4th and 5th totalled $1,139.42.
 
 
 8
 Mark Stover was the attendant on duty for the day shift on August 4th and no manager was on duty or present at the time in question.[3] Stover did not sweep or clean the lot during the day but he removed empty wooden cartons from the stacks of soda on at least six occasions, primarily from the stacks at either end of the island closest to the store, as that was where most of the soda purchased was initially placed. Normally, the lot was swept during the night shift, sometime between 11:00 p.m. and 7:00 a.m., but the attendant during the evening prior to the accident (August 3rd) did not recall whether or not he had swept that night. The station manager did not maintain a set policy as to how often the outside area was to be cleaned. There was testimony from an employee that she asked Mark Jones, the station manager, to obtain more help because the station was understaffed and that he relayed such a request to his superiors, which went unheeded.
 
 
 9
 Stover did not see any type of spill in the pump area nor did anyone report any spills to him that day. There was testimony, however, that spills in general occurred once or twice during each shift, depending upon the day's business. Mark Jones, the station manager, was aware of the daily spills. From inside the station, Stover and other attendants had a limited (obstructed) view of the outside area.
 
 
 10
 At approximately 4:45 p.m., on August 4th, Mrs. Culli drove her car up to the far side of the first set of islands closest to the store. She filled her gas tank and then crossed the pump island and went into the store to pay for her gas and purchase soda. She purchased five eight-pack cartons and picked up two of them on the way out. On her return to her car, Mrs. Culli crossed back over the pump island a few feet from where she had crossed it on the way to the store. When she stepped off the island, she slipped and fell.
 
 
 11
 Mrs. Culli was attended to by Stover and Janice Moore, an attendant who had just arrived for the next shift (to replace Stover). Moore called an ambulance. James Mullaney of the Litton Ambulance Service arrived to assist Mrs. Culli. He testified at trial that he noticed a slippery substance on Mrs. Culli's shoes and on her calf. Mrs. Culli also testified that she noticed the slippery substance. Neither Mullaney nor Mrs. Culli could positively identify this substance and Stover and Moore testified that they did not notice any slippery substance on or near Mrs. Culli. Stover admitted at trial, however, that he did not investigate to see if there was any substance on the pavement or what might have caused Mrs. Culli's fall.
 
 
 12
 In addition to the presence of a slippery substance on Mrs. Culli's shoe and calf, Mr. Mullaney testified that he saw a spill or some substance in a pool approximately eight to ten inches in width and length which looked like a slippery film and appeared to be a product typically found at a gas station or pantry. According to Mullaney, the substance could have been oil or gasoline but he was not positive. It was a "clearish type of thing" which may have been mixed with dirt or some other substance because when he wiped it off it had a brownish tinge.
 
 
 13
 At trial, the plaintiffs did not establish how long the slippery substance was on the lot before Mrs. Culli fell. The defendants claim on appeal, as they did at trial, that they could not have had constructive notice of a dangerous condition, the slippery substance, as a matter of law without evidence establishing the identity of the substance and the length of time it was present.
 
 
 14
 Over the defendants' objections, the plaintiffs were permitted to introduce evidence concerning the fact that the gas station did not always stock "oil dry," a substance similar to and possibly mixed with cat litter which is used to clean up spills, e.g., oil and gas spills. The defendants claim that this testimony was prejudicial and irrelevant to establishing constructive notice.
 
 
 15
 There was testimony from several employees of the defendants with respect to how Mrs. Culli's accident was investigated, photographed and reported. The plaintiffs apparently argue on appeal that there was something improper or dishonest with respect to how and when the defendants reported the accident and whether or not photographs of the scene of the accident were taken soon after Mrs. Culli's fall and whether they were used to complete the accident report. There are no claims on appeal, however, that the introduction of any evidence or exhibits concerning the defendants' accident report or photographs was improper. According to the plaintiffs, any concerns they had with respect to this evidence were brought out in the plaintiffs' favor on cross-examination.
 
 
 16
 Mrs. Culli was treated for a compound fracture of her left ankle. She spent several days in a hospital and subsequently used a wheelchair and walker for a few months and later underwent physical therapy and other medical treatment. She returned to work on April 1, 1985.
 
 
 17
 The parties agree that the defendants' liability is determined by Illinois law. The issues on appeal are: (1) may a property owner be found to have constructive notice of a dangerous condition created by a slippery substance when there is no evidence establishing how long the substance existed on the premises? (2) may the presence of a slippery substance be found to be a part of a pattern of conduct to establish a property owner's constructive notice of this substance when the substance has not been positively identified? and (3) did the district court abuse its discretion by allowing the plaintiffs to present evidence of the defendants' general practices concerning stocking "oil dry"?
 
 STANDARD OF REVIEW
 
 18
 On appeal, we review de novo the district court's denial of the defendants' motions for judgment notwithstanding the verdict and a new trial, Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 15 (7th Cir.1987), under the same standard applied by the district court: viewing the evidence in a light most favorable to the non-movant, was there substantial evidence to support the jury's verdict. Mulay Plastics, Inc. v. Grand Trunk Western R.R. Co., 822 F.2d 676, 679 (7th Cir.1987); Webb v. City of Chester, Illinois, 813 F.2d 824, 828 (7th Cir.1987). In addition, because the plaintiffs could have succeeded under one of two alternative independent theories of relief, and the jury returned a general verdict as opposed to a special verdict which, for example, could have included specific findings with respect to each theory of relief, we need only find that there was substantial evidence to support the jury's verdict under at least one of the two alternative theories. Cannon Oil & Gas Well Service v. Evertson, 836 F.2d 1252, 1254-55 (10th Cir.1987). See also Simmons v. Pinkerton's Inc., 762 F.2d 591, 599 n. 3 (7th Cir.1985) (a jury's verdict is assumed to be based on a valid theory of liability where the court's instruction could have led to a finding of liability based on an alternative invalid theory). Finally, we review the trial court's evidentiary rulings contested on appeal to see whether they were a clear abuse of discretion. Davis v. Lane, 814 F.2d 397, 399 (7th Cir.1987).
 
 ANALYSIS
 
 19
 The defendants, as property owners, were not insurers of the plaintiffs' safety. Anderson v. Woodlawn Shell Inc., 132 Ill.App.3d 580, 87 Ill.Dec. 871, 873, 478 N.E.2d 10, 12 (1st Dist.1985). However, they owed the plaintiffs, invitees, the duty of maintaining their property in a reasonably safe condition.[4] This includes a duty to inspect and repair dangerous conditions on their property or give adequate warnings to prevent injury. Chapman v. Foggy, 59 Ill.App.3d 552, 16 Ill.Dec. 758, 761, 375 N.E.2d 865, 868 (5th Dist.1978) (citations omitted). See also Higgins v. White Sox Baseball Club, Inc., 787 F.2d 1125, 1128 n. 2 (7th Cir.1986). To be liable, the defendants must have had actual or constructive notice of the dangerous condition. Olinger v. Great Atlantic and Pacific Tea Co., 21 Ill.2d 469, 173 N.E.2d 443, 445 (1961); Nicholson v. St. Anne Lanes, Inc., 136 Ill.App.3d 664, 91 Ill.Dec. 9, 12, 483 N.E.2d 291, 294 (3rd Dist.1985).
 
 
 20
 There was no evidence that the defendants placed the substance on their property and both parties agree that the defendants did not have actual notice of any dangerous condition. Constructive notice can be established under Illinois law under two alternative theories: (1) the dangerous condition existed for a sufficient amount of time so that it would have been discovered by the exercise of ordinary care, Chapman, 16 Ill.Dec. at 761, 375 N.E.2d at 868, or (2) the dangerous condition was part of a pattern of conduct or a recurring incident. Dunlap v. Marshall Field & Company, 27 Ill.App.3d 628, 327 N.E.2d 16, 19 (1st Dist.1975).
 
 
 21
 Constructive Notice Theory # 1: Sufficient Time
 
 
 22
 The defendants argue that they cannot be held liable under the first constructive notice theory (that the danger should have been discovered and remedied) absent some evidence establishing how long the slippery substance was on their property prior to Mrs. Culli's fall. They contend that it is possible that the substance was there for only a matter of seconds or minutes before her accident, and if so imposing liability would be contrary to Illinois law.
 
 
 23
 In Hayes v. Bailey, 80 Ill.App.3d 1027, 36 Ill.Dec. 124, 400 N.E.2d 544 (3rd Dist.1980), a plaintiff slipped and fell on a wet floor in a rest room. The rest room had been inspected 2.5 hours prior to her accident but there was no evidence of how long the water had been there. The court held that in a constructive notice case where the plaintiff is relying on the theory that the dangerous condition existed for a sufficient amount of time so that it should have been discovered by the exercise of ordinary care,
 
 
 24
 the time element to establish constructive notice is a material factor (Blake v. Dickinson, [31 Ill.App.3d 379, 332 N.E.2d 575 (3rd Dist.1975) ], and it is incumbent upon the plaintiff to establish that the foreign substance was on the floor long enough to constitute constructive notice to the proprietor.... In the instant case, there is no evidence at all as to how long the water had been on the floor of the rest room. Plaintiff simply testified that she slipped and fell and that after she was on the floor she noticed she was wet. In the absence of any evidence tending to show constructive notice we believe it was proper to not submit the case to the jury and to direct a verdict for the defendant.
 
 
 25
 Id. 36 Ill.Dec. at 126, 400 N.E.2d at 546.
 
 
 26
 In Hresil v. Sears, Roebuck & Co., 82 Ill.App.3d 1000, 38 Ill.Dec. 447, 403 N.E.2d 678 (1st Dist.1980), a plaintiff sought damages for the injuries she suffered when she slipped on a foreign substance in the defendant's self-service store. The plaintiff described the substance as a "gob" and the heel of her shoe made an imprint on the gob on the floor. An employee commented that the gob looked like phlegm. 38 Ill.Dec. at 448, 403 N.E.2d at 679. At the time of her accident, there were few customers in the store and, due to the inactivity in the store at the place where she fell, the foreign substance could have been on the floor for at least ten minutes. Ibid.
 
 
 27
 The court found that, as a matter of law, ten minutes was not long enough to give Sears constructive notice of the gob. The store was not crowded at the time of the plaintiff's accident, salespersons were present, and "[t]o charge the store with constructive notice of the presence of the substance would place upon the store the unfair requirement of the constant patrolling of its aisles." Id. 38 Ill.Dec. at 449, 403 N.E.2d at 680.
 
 
 28
 In Chapman, the owner and operator of a roller skating rink was found liable for the injuries suffered by a patron who used a wooden railing located on top of a restraining wall around the skating rink and caught a splinter in her forearm. In reviewing the circuit court's denial of a directed verdict, the appellate court found that the defendant had reason to constantly inspect the railing, and more importantly "there was evidence that the railing had been in a splintering condition for a period of time prior to the instant occurrence." 16 Ill.Dec. at 761, 375 N.E.2d at 868. There was testimony that splinters were "sticking out of the rail" such that their presence was "relatively obvious" and that the condition "had existed for some time, ..." Id. 16 Ill.Dec. at 762, 375 N.E.2d at 869. Finally, there was evidence that the defendant's employees washed the rail after each skating session, giving the defendant constructive or actual notice of the defect. Ibid.
 
 
 29
 Constructive notice was not established in Dunlap. There, the plaintiff slipped on a discarded lollipop stick while shopping in the defendant's store. The trial court granted the defendant's motion for a directed verdict, finding that the plaintiff had not presented sufficient evidence to charge the defendant with constructive notice. The fact that the lollipop was flattened and dirty was insufficient evidence to establish its presence for a sufficient amount of time "to support an inference of constructive notice," especially because the presence of a lollipop stick in the aisle of a department store did not create an "extra-hazardous situation." 327 N.E.2d at 20.
 
 
 30
 Other cases where evidence established that a dangerous condition was present for a long enough period of time to put the defendant on constructive notice include Koehler v. Great Atlantic and Pacific Tea Co., 90 Ill.App.2d 458, 232 N.E.2d 780, 782-83 (2d Dist.1967), where a waxy substance was probably present for at least four days prior to an accident and the property owner's sweeping failed to remove the substance; Arden v. Chicago Transit Authority, 89 Ill.App.2d 214, 232 N.E.2d 501 (1st Dist.1967), where debris was present on a stairway for at least three hours prior to an accident, such debris usually accumulated on the stairs, the area had poor lighting and the defendant improperly directed the plaintiff to use the stairs; Guidani v. Cumerlato, 59 Ill.App.2d 13, 207 N.E.2d 1, 15 (1965), where water in a bathroom was spotted by an uninjured patron forty-five to sixty minutes before the plaintiff slipped; and Blake, 332 N.E.2d at 579, where the plaintiff fell on ice which had been present on the defendant's property for several days.
 
 
 31
 The gas station at the time of Mrs. Culli's fall was very busy. It was a Saturday afternoon, a very successful soda sale was going on and only one employee was present. Stover had been alone at the station for approximately three and one-quarter hours prior to Mrs. Culli's accident. See note 3, supra. Indeed, he had no time to sweep the premises and left the cash register only to replenish the soda supply. The property may not have been cleaned the night before. Spills, which occurred one to two times per day, would more likely occur during the busier daytime and it would be reasonable to expect that the defendants would clean the premises at such time. In addition, Mulaney's description of the foreign substance is consistent with that of a substance generally found on a gas station lot.
 
 
 32
 However, because of the lack of testimony establishing how long the substance was present, we do not know if the substance was present at the gas station for a period of time which would have placed the defendants on constructive notice of a dangerous condition. It could have been present for a few minutes or several hours. The cases cited above indicate that under the first constructive notice theory evidence establishing how long the particular substance was present is necessary.
 
 
 33
 Contrary to the defendants' assertion, the identity of the substance need not be positively established, as it was not here. How long the substance was present could be established by circumstantial evidence. See Papadatos v. National Tea Company, 21 Ill.App.3d 616, 316 N.E.2d 83, 85-86 (1st Dist.1974). Based on the type of products sold on the defendants' property, it could have been one of many different types of substances, many of which are slippery. However, we are still without evidence establishing how long it was present. The vague description of the substance on which Mrs. Culli slipped, and the fact that the area was not swept for at least nine and three-quarter hours, does not establish how long the substance was present.
 
 
 34
 The defendants sold several products which could be described as slippery and based on the heavy volume of sales during the day in question a spill may have occurred at any time during that day. Mullaney testified that dirt may have been mixed in with the slippery substance. Dirt is likely to be present on the concrete surface of a filling station and could have mixed with any other substance immediately after a spill.
 
 
 35
 In addition, Mullaney described the spill as being eight to ten inches in width and length. It seems likely that patrons would notice such a substance and report it shortly after it was spilled. Finally, Stover's six trips to replenish supplies were primarily around the area where Mrs. Culli fell and it is also likely that he would have noticed a spill described by Mullaney if it were present for a long time, although his attention was focused on replenishing supplies for the soda sale.
 
 
 36
 The defendants may not have exercised reasonable care when they failed to look for spills during the day in question, especially when increased activity was going on and a soda sale was in progress. However, it would be unreasonable to conclude, under the first constructive notice theory, that this proximately caused the injury, given the fact that the spill could have occurred just prior to the accident.
 
 
 37
 Constructive Notice Theory # 2: Pattern or Practice
 
 
 38
 The defendants argue that there was no evidence establishing that Mrs. Culli's injury is part of a pattern of conduct or recurring incident which would constitute constructive notice of a dangerous condition. They initially contend that because the substance was not positively identified, the cause of the fall cannot be tied to any pattern. CitingDunlap, the defendants argue that it is just as likely that Mrs. Culli fell on some substance which is foreign to the gas station, such as melted ice cream or suntan lotion, as it is that she fell on something usually found at the station.
 
 
 39
 In Dunlap, the plaintiff slipped on a discarded lollipop stick in an aisle near the defendant's candy counter and argued, among other things, that this was part of a "recurring dangerous condition." 327 N.E.2d at 19. The court rejected this theory, noting that there was no evidence that: (1) lollipops were consumed in the store, a store which is a major department store which sells furniture and clothing among other things; (2) there were prior incidents involving similar dangerous conditions; or (3) that the stick in question was used in the candy sold by the defendants. Id. at 19-20.
 
 
 40
 The facts in Dunlap are significantly different from those here. Contrary to the defendants' interpretation of his testimony, Mr. Mullaney testified that he was not sure if the substance was oil or gas, but it could have been. It was his job to attend to Mrs. Culli's injury, not investigate the cause of it. Even if the substance was ice cream or suntan lotion, there was evidence establishing that spills were a daily occurrence and that they were only cleaned, if at all, during the night shift. In addition, the gas station sold several products other than gas and oil which were "consumed" on their property, and which if spilled would create a dangerous condition.
 
 
 41
 A pattern or practice of a particular type of spill is not necessary. What is needed is a pattern of dangerous conditions which were not attended to within a reasonable period of time. If the dangerous condition "is part of a pattern of conduct or a recurring incident," this may establish liability. Perminas v. Montgomery Ward & Co., 16 Ill.App.3d 445, 306 N.E.2d 750, 755 (1st Dist.1973), rev'd on other grounds, 60 Ill.2d 469, 328 N.E.2d 290 (1975). Interestingly, the defendants concede that the record below includes "much evidence concerning the Defendants' alleged failure to frequently inspect the premises for defects." Defendants-Appellants' Brief at 9.
 
 
 42
 In explaining his decision to deny the defendants' motion for a directed verdict, Judge Beatty accurately summarized the testimony as follows:
 
 
 43
 The evidence is that this is a 24 hour operation, that the policy at least as to this station is to sweep and clean on what they call the graveyard shift which is eleven to eight to something like that, so that means that during the rest of the other sixteen hours in the day, no one is sweeping it or cleaning it up, although they said the policy was that they should get out and look around and pick up anything that's on the premises.
 
 
 44
 We have a self service filling station which by definition almost means that you're going to have probably more oil and gasoline and other products that are put into the car spilled in and about the place than you would presumably where you had trained attendants dispensing the products.
 
 
 45
 In any event, in any filling station, you're going to have these things, particularly during your high volume hours which were the hours when there wasn't anybody designated to sweep and clean the place up, which was in the graveyard shift.... [T]he substance of [Stover's testimony] was that he didn't spend too much time looking around that day. I think that, and I am not too sure the defendant doesn't have to have notice of this particular puddle of whatever it was. He doesn't even have to have constructive notice of this particular puddle. He either has to have notice, actual or constructive, that in and about these pumps, there are going to be spills and products accumulate there, and should have a, someone inspecting it and taking care of it and there is no evidence that they did that.
 
 
 46
 Tr. Vol. II, pp. 164-66.
 
 
 47
 There was substantial evidence presented at trial establishing that there were spills on a daily basis in the pump area and that the volume of sales on the day in question made it unreasonable for the defendants to sweep the lot only at night and operate for most of the day with only one attendant who was primarily confined to the cash register. The evidence, when viewed in a light most favorable to the plaintiffs, is sufficient to support the jury's verdict that the defendants' maintenance of their property was unreasonable and proximately caused Mrs. Culli's injury.
 
 
 48
 Evidence Of The Defendants' Failure To Stock "Oil Dry"
 
 
 49
 The defendants objected to the admission of testimony regarding their failure to stock "oil dry," arguing that it is irrelevant and highly prejudicial and, accordingly, its admission under Fed.R.Evid. 403 was an abuse of discretion. The plaintiffs' counsel also referred to this evidence during his closing argument. Whether or not the gas station kept a stock of "oil dry" is not probative of whether the substance was present long enough to give the defendants constructive notice of the dangerous condition (theory # 1). It was relevant, however, to prove that Mrs. Culli's injury was related to a pattern of dangerous conditions at the station which were not attended to on a reasonable basis (theory # 2).
 
 
 50
 The defendants contend that Schultz v. Richie, 148 Ill.App.3d 903, 102 Ill.Dec. 289, 499 N.E.2d 1069 (4th Dist.1986), appeal denied 114 Ill.2d 558, 108 Ill.Dec. 425, 508 N.E.2d 736, (1987) stands for the proposition that the oil dry testimony here was irrelevant. We disagree. In Schultz, the plaintiff fell on ice which had accumulated on a front porch beneath an area where no gutter was attached to the defendant's home. The plaintiff was permitted to introduce evidence that there were no gutters in place above the area where he fell at the time in question (1982). He also attempted to introduce testimony that gutters previously in place in that area (from 1957 to 1973) were removed some time before the accident (in 1981). The court precluded the admission of this evidence, holding that
 
 
 51
 the issue was not whether the defendants had a duty to have gutters on the porch roof, nor was the issue whether defendants were negligent in removing the gutters or failing to replace them. Rather, the issue was whether at the time of the occurrence, defendants were negligent in failing to divert, in some way, the flow of water ... which resulted in a buildup of ice on the step.
 
 
 52
 102 Ill.Dec. at 291, 499 N.E.2d at 1071.
 
 
 53
 The jury in Schultz did not need to hear testimony concerning the previous use of gutters; the evidence introduced established that gutters were not in place at the time in question. That was sufficient for the jury to determine whether the defendants' property was unreasonably maintained. In addition, when the gutters were previously in place, from 1957-1973, the property was occupied by a different owner. Moreover, whether or not gutters were in place during this period did not relate to whether the defendants were on constructive notice of a dangerous condition. Indeed, the court did not discuss constructive notice in its opinion.
 
 
 54
 The question of negligence in Schultz was resolved by evaluating the condition of the defendants' property at the time of the plaintiff's injury. The condition was evaluated by considering evidence which included the fact that no gutters were attached at that part of the home. That testimony was introduced, properly, in Schultz. Like the absence of oil dry here, the absence of a gutter was a factor which determined whether the defendants reasonably maintained their property. Although the gutters are intended to avoid a dangerous condition and the oil dry is intended to repair a dangerous condition, both facts in their respective cases were relevant and admissible to establish whether the defendants' property was reasonably maintained.
 
 
 55
 The evidence presented was that oil dry was obtained on an as needed basis and paper towels or other things were also used to clean spills. Thus, the defendants made use of the opportunity to dismiss the significance (weight) of the oil dry evidence. The defendants argue that whether or not they were capable of properly cleaning up a spill is irrelevant, the issue is whether they had constructive notice of the spill in question. In other words, by providing the jury with this evidence, the defendants could be found liable for their general practices rather than their conduct during the day in question.
 
 
 56
 The defendants' general practices, however, are the gist of the second constructive notice theory. By engaging in a pattern and practice of inadequate inspection and maintenance of their property, the defendants created an environment where it was likely that a dangerous condition would not be discovered and remedied. Testimony established that spills occurred on average once or twice a day. If the defendants regularly inspected and maintained a supply of cleaning agents and materials necessary to remedy such dangerous conditions, it seems likely that they would be used and spills be taken care of in a reasonably brief period.
 
 
 57
 Of course the fact that the defendants did not regularly maintain "oil dry" is not conclusive evidence that they engaged in a pattern of unreasonable maintenance. They did not have a duty specifically to stock oil dry. However, in conjunction with the facts that slippery substances were sold on the premises, the property was cleaned perhaps once per day, inspection of the pump area was sporadic at best and one attendant was kept on duty even on a busy day such as August 4, 1984, the evidence concerning the oil dry was relevant and admissible. The district court did not abuse its discretion in allowing the introduction of this evidence. In addition, with respect to the oil dry evidence, there is no allegation that the jury was improperly instructed.
 
 CONCLUSION
 
 58
 Viewing the evidence in a light most favorable to the plaintiffs, substantial evidence supports the jury's verdict that the defendants were on constructive notice of a dangerous condition since such condition was a recurring situation on their property and their maintenance of the property was unreasonable and proximately caused Mrs. Culli's injury. Because the jury returned a general verdict, we can affirm on this theory alone. Finally, the district court's admission of evidence concerning the presence or absence of oil dry was not an abuse of discretion.
 
 
 59
 The defendants contended at oral argument that a finding of liability would be tantamount to a directive outlining how many attendants are required to be on duty at any given time and how often the premises must be cleaned. Our decision does not impose such a schedule. Instead, we must decide whether substantial evidence supports the jury's finding that the defendants' maintenance of their property was unreasonable as established in this case. On the other hand, the defendants had a duty to have sufficient attendants and an inspection cleaning policy adequate to discover and eliminate recurring dangerous conditions within a reasonable time. Based on the record below, we believe the jury's verdict with respect to constructive notice theory # 2 is supported by substantial evidence. We leave it to the defendants to determine what prudence requires in the future.
 
 The decision of the district court is
 
 60
 AFFIRMED.
 
 
 
 *
 The Honorable Hubert L. Will, Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation
 
 
 [1]
 Both plaintiffs are Illinois citizens, defendant Marathon Petroleum Company is an Ohio corporation with its principal place of business in Ohio and defendant EMRO Marketing Company is a Delaware corporation with its principal place of business in Ohio
 
 
 [2]
 The jury awarded Mrs. Culli $87,500 and Mr. Culli $3,000
 
 
 [3]
 A manager would normally be present during the morning or a shift change. Mark Jones, the manager, was apparently on duty on August 4th from 5:45 a.m. to 1:30 p.m. Mark Stover worked from 9:15 a.m. to 6:05 p.m. and Janice Moore, his replacement, worked from 5:15 p.m. to 11:15 p.m. An accident report completed by the defendants indicates that the station manager, Mark Jones, was not on duty at the time of the accident: under the heading "Asst. Mgr's Name (If Mgr. Not On Duty)," the report lists Sherry Wright. Mrs. Wright testified that she was not at work at all that day because she was having a birthday party for her son. Tr. Vol. I, p. 36. There is no dispute that a manager was not on duty at the time of Mrs. Culli's accident and that only Mark Stover, the attendant, was present
 
 
 [4]
 Under the Premises Liability Act, Ill.Rev.Stat.1984 Supp., ch. 80, par. 301 et seq., effective September 12, 1984, Illinois law no longer makes any distinction between the duty of care owed to invitees and licensees by the owner or occupier of property. In either case, the duty is to exercise reasonable care. St. Phillips v. O'Donnell, 137 Ill.App.3d 639, 92 Ill.Dec. 354, 356, 484 N.E.2d 1209, 1211 (2d Dist.1985)