2020 IL App (1st) 190606

THIRD DIVISION
July 29, 2020

No. 1-19-0606

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| JORGE TAFOYA-CRUZ and DULCE JAMIES, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 16 L 62019 |
| TEMPERANCE BEER COMPANY, LLC, and | ) | |
| GILBERT KAEDING, INC., d/b/a GILBERT | ) | Honorable Jeffrey L. Warnick, |
| KAEDING ARCHITECTURE + DESIGN, | ) | Judge Presiding |
| | ) | |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1      After a day spent drinking beer and fixing cars at his auto-repair shop, plaintiff Jorge

Tafoya-Cruz went to a craft brewery in Evanston, Illinois, defendant Temperance Brewing

Company, where he continued drinking. When plaintiff later entered Temperance's restroom, he

slipped on a wet surface and fell, causing serious injuries to his back.

¶ 2      Plaintiff sued Temperance and the firm that designed the tavern for negligence, adding

consortium claims by plaintiff's wife. Relevant to this appeal is only plaintiff's negligence count

against Temperance (and the derivative consortium claim). The trial court entered summary

judgment in Temperance's favor, ruling that plaintiff could not establish Temperance's

constructive notice of any wet substance on the floor, because plaintiff could not prove how long the alleged wet substance was present on the floor before the slip and fall. Plaintiff moved to reconsider, but the trial court denied that motion, ruling that plaintiff was attempting to raise a new theory for the first time on reconsideration. We agree with the trial court's judgment and affirm.

¶ 3                                I. BACKGROUND

¶ 4     On March 22, 2016, plaintiff filed a single-count negligence lawsuit against Temperance. He later added other claims and defendants not relevant to this appeal regarding negligent design and spoliation of evidence. Before this court, he appeals only the grant of summary judgment in favor of Temperance on his negligence claim and his wife's claim for loss of consortium.

¶ 5     The complaint alleged that on the evening of September 25, 2015, plaintiff went to Temperance, a craft brewery located in Evanston, Illinois.  He later slipped on the bathroom floor due to the presence of a wet surface on the floor. He alleged that Temperance knew or should have known of that dangerous condition and failed to remediate it.

¶ 6     Temperance moved for summary judgment on the negligence claim, arguing in relevant part that it had no actual or constructive notice of the alleged wet surface in the bathroom. Temperance supported that motion with deposition testimony from (1) plaintiff, (2) Joshua Gilbert, one of the owners of Temperance; and (3) Benjamin Geerts, Temperance's manager. The gist of the argument was that plaintiff could not prove that Temperance either caused the wet substance to be on the floor or knew, actually or constructively, of its existence. As to constructive notice, the issue on appeal, Temperance argued that plaintiff could not establish that the alleged wet surface in the bathroom existed for a sufficient period of time that Temperance should have known of its existence. Plaintiff responded to the motion and cited additional

deposition testimony from (4) Mike Van Camp and (5) Meagan Atkins, the bartenders who were on duty when plaintiff was at Temperance. We review these five deponents' testimony below.

¶ 7                                    1. Plaintiff

¶ 8      At his deposition, plaintiff testified that in September 2015, he worked two jobs—one as a mechanic at a landscaping company in Evanston, and one as a mechanic at an automotive repair shop he and a friend opened in Chicago in July 2015. Plaintiff testified that on the evening of September 25, 2015, he was working at his automotive repair shop. Sometime "a little bit before" 9 p.m., plaintiff and a man named Enrique left the shop and went to Temperance. Plaintiff admitted that, before leaving for Temperance, he had consumed "five or six beers" at his shop over the course of "two or three hours" while he was fixing a car.

¶ 9      When plaintiff and Enrique arrived at Temperance, they met a third man who was friends with Enrique. Once assembled, the group headed to the bar and ordered a round of beers. Plaintiff drank his beer and then left to go to the bathroom, about a half-hour after arriving. He recounted his journey to the men's room succinctly: "So I went to the bathroom. I went behind the bar that was there, and I went into the bathroom. I did not take even two steps, and I fell, because of the liquid that was on the ground." The following colloquy then occurred:

> "Q. Okay. Do you know what kind of liquid it was? Or strike that. When did you first see liquid on the floor?
>
> A. I did not see it. I fell down and ended up sitting down. I—Because of the pain I was feeling, I lied [sic] down. And when I got up, that's when I noticed that my shirt was wet and my pants were completely wet."
>
> Q. Do you know what kind of liquid it was?
>
> A. No.

Q. Do you know how it got there?

A. No.

Q. Do you know how long it was there for?

A. No."

¶ 10    Plaintiff then got up, took note of his wet clothes and the wet floor, and walked over to the urinal to relieve himself. He was pressed on details:

"Q. So you saw a liquid on the floor.

A. When I was lying down; yes.

Q. Describe it.

A. I don't remember. It was really wet; because, when I got up, my pants were really wet and my shirt, here.

Q. I understand that, but I'm asking you: Did you actually see liquid on the floor after your fall?

***

A. After I fell, I noticed that there was liquid on the floor

Q. So what I'm asking you to do is describe the liquid. Was it a big puddle? Was it a couple of drops? Was it a streak? What did it look like?

A. It was wet.

Q. I understand, but I'm asking you to describe it.

Was it like a streak, as though someone had mopped it; or was it a big puddle of water, as though someone had dumped a bucket on the ground; or was it a few drops of water from someone that had been washing their hands and shook their hands on the floor?

4

A. There was a lot of water. Or liquid. I don't know what it was.

Q. How big—Was it a—Was it a solid puddle?

A. I did not see how big it was. But I think it was a lot because I got up, and my pants were wet."

¶ 11    As he left the restroom and started walking back to the bar, plaintiff lost feeling in his feet and fell to his knees. A "short while" later, a man saw him and asked what happened. Plaintiff told the man that he couldn't feel his feet and that he had fallen in the bathroom. According to plaintiff, the man responded, "You are really, really drunk. I'm going to bring you some water." When the man returned, plaintiff asked him to call an ambulance because the pain he was experiencing was "very strong" and he "wasn't able to tolerate it."

¶ 12    According to plaintiff, the man then "called two or three other persons" and said, "Let's get him out of here." The three men then "dragged" him by his hands through a hallway and seated him near the bar. At that point, plaintiff renewed his request for an ambulance. Plaintiff then called his wife.

¶ 13    After that, the three men took plaintiff outside by placing their hands underneath his arms and essentially carrying him out of the bar. Once outside, plaintiff called 9-1-1. However, he disconnected the call midstream because he "could not stand the pain anymore." At that point, police officers arrived, and then an ambulance, which took plaintiff to the hospital.

¶ 14    Though he admitted to drinking five or six beers before arriving at Temperance and drinking another before entering the bathroom, and though toxicology records showed that his blood alcohol concentration at the hospital was .183 (more than twice the legal limit to drive a car in Illinois), plaintiff denied that he was intoxicated when he slipped in the bathroom. Temperance's attorney then asked plaintiff if the hospital staff was unable to perform an MRI

"because of [plaintiff's] level of intoxication?" Plaintiff denied being intoxicated and insisted that the MRI was not performed because he "could not stand the pain." Plaintiff also denied that the reason his clothes were wet in the bathroom was because he had urinated on himself, despite a record from the emergency room suggesting that possibility.

¶ 15                                 2. Joshua Gilbert

¶ 16    Joshua Gilbert, the principal owner of Temperance, was not present at Temperance on September 25, 2015, but he viewed surveillance footage that depicted plaintiff and his friends, both before and after the fall. Gilbert prefaced his testimony by explaining the configuration of Temperance's taproom and the location of its security cameras. Specifically, Gilbert noted that to get to the bathrooms, patrons have to enter a "little vestibule" and that, due to the location of the security cameras, it was not possible to "see what happens" once somebody enters the vestibule that leads to the bathrooms.

¶ 17    After recounting footage showing plaintiff and his friends ordering beers, and plaintiff's friends attempting to dance with some women, Gilbert testified that "[r]eally, the memorable moments for me were when your client [*i.e.*, plaintiff] walked to the bathroom." Gilbert explained that as he walked, plaintiff was "leaning against the wall as he walked with his left hand, he so looked very slow and unstable." After entering the vestibule, the camera lost visual contact with plaintiff. When he next appeared, plaintiff "just all of a sudden kind of slid on his belly out from the little bathroom vestibule toward the food prep area" near the door to the men's bathroom. Continuing, Gilbert explained that:

> "it's like he came out of the bathroom, turned right to try to go back into the main
>
> taproom, and somehow got on his belly with a significant momentum *** such that his

head actually went into the opening of the food prep area. Luckily, there's no door there, it's just a shower curtain. So he didn't hit his head or anything."

¶ 18    According to Gilbert, at that point, plaintiff stopped moving. A few moments later, Geerts (the manager) and a patron went to plaintiff. Someone then got a barstool, and "the guys who were there" helped plaintiff onto the stool. At some point during all of this, one of plaintiff's shoes came off. Once plaintiff was seated, Geerts offered plaintiff a glass of water, and someone put his shoe back on.

¶ 19    On cross-examination by Temperance's attorney, Gilbert testified that plaintiff appeared to be intoxicated at the time of the incident. He based that belief on the fact that the surveillance footage showed plaintiff "stumbling," "walking slowly," and "walking with the assistance of the wall towards the bathroom," as well as plaintiff's "subsequent slide *** headfirst into the food prep room" and his shoe somehow coming dislodged from his foot.

¶ 20                            3. Benjamin Geerts

¶ 21    Geerts testified that he is the "bar manager" of Temperance's taproom. He explained that on Fridays and Saturdays, he works as "basically a roaming manager." In that role, Geerts explained, he acts as an "extra body to go around and make sure stuff is clean and the bartenders aren't taken out of their bartending duties." Geerts testified that as a matter of policy, Temperance required that bathrooms be checked every hour. However, he noted that as a matter of personal policy, when the taproom is more crowded—as was the case when plaintiff was there—he tries to check the bathrooms every 30 minutes.

¶ 22    With respect to the bathrooms, Geerts testified that that he has "never witnessed water" on the floor "unless something broke in there and we clean it up." He clarified:

"I have seen, from when people go to the sink to the hand towel, like honestly, I've seen drops. But if that is seen, we clean. So we'll get—we have rags behind the—dry rags behind the bar. You just go in and wipe it down, and then put the sign—if it's—I've only had to put the sign up—never for that. It's like if something breaks or if we are—when before we open, it's still mop water, I'll put that down. But we've never had to do that, really."

Thereafter, plaintiff's attorney asked Geerts if he has "ever seen water drops accumulate to what would be a small puddle?" Geerts responded, "Never."

¶ 23     Geerts testified that plaintiff arrived at Temperance accompanied by two people sometime after 9 p.m. Geerts first noticed plaintiff after one of plaintiff's friends walked behind a group of women and began "mimicking dancing that was inappropriate." In response, Geerts told the group, "This is not a place like that. Please don't do that again, or I'm going to have to ask you guys to leave."

¶ 24     After that interaction, Geerts went back behind the bar and told the other bartenders to make sure that plaintiff's friend didn't go back behind the women and dance again. According to Geerts, the group "seemed okay for a little bit." However, eventually, he "witnessed [plaintiff], like they—could tell they already had some drinks is what I noticed. So I didn't want to give them anymore." Geerts then left the bar "to go do something real quick."

¶ 25     While he was gone, a different bartender had served plaintiff and his friends another round of beers. When Geerts returned, he saw they had been served again. He testified that "the minute they got the beers, I went over and said, Hey, I'll give you your money back, but I don't think—you're not going to have any more beer." Geerts then proceeded to physically take the

8

beers out of plaintiff's and his friends' hands. He explained that he "just figured they had had enough from somewhere else."

¶ 26    At that point, Geerts saw plaintiff walk towards the bathroom. Geerts testified that "[a]bout three seconds later, I came around the bar and walked—followed him, make sure he got in there, and then I propped open the door." Clarifying, Geerts explained that "[plaintiff] went in. I saw the door closed, and then I immediately followed him and just opened the door and looked to make sure he wasn't doing anything." According to Geerts, he went about halfway into the bathroom for approximately ten seconds. There, he saw plaintiff standing in front of a urinal, "leaning against the partition from the actual toilet and the urinal[,]" "[l]ike, right side against it, like someone who is intoxicated." Geerts testified that when he went into the bathroom, he "did not specifically look" to see if there was any liquid on the ground, and he "didn't notice anything."

¶ 27    Geerts explained that he decided to follow plaintiff to confirm that he went to the bathroom, rather than the food prep room or "the women's bathroom or something, like, odd." He then explained that he decided to follow plaintiff into the bathroom itself to make sure "no one else was in there, to be honest, and something weird happened, you know." Continuing, he explained that "I knew they were drunk so I was kind of just, like, looking for—honestly, himself, and other customers." As for how he knew plaintiff was drunk, Geerts pointed to his interaction with plaintiff and his friends when he confiscated their beers, stating, "once I went back and took the beers, I could just tell in their body language and, you know, the one guy started swearing at me—the middle guy that said everything was cool and then he started swearing at me, and then I was like, All right."

9

¶ 28    After he confirmed that plaintiff went into the men's bathroom, Geerts then returned to the bar. Approximately 20 to 25 seconds later, a customer yelled to get Geerts's attention and said someone had just fallen. At that time, plaintiff was "on the floor in the hallway." Geerts left the bar and went over to plaintiff. Plaintiff was sitting on the floor leaning against a cooler, with one of his shoes off. Geerts asked plaintiff if he was ok and needed some air. Despite there being "a little bit of a language barrier," Geerts understood that plaintiff responded "yeah." According to Geerts, plaintiff looked "intoxicated," but he did not appear to be in pain or "discomfort."

¶ 29    Another customer brought a stool, and Geerts went to get plaintiff a glass of water. Geerts then went to get plaintiff's friends, and he also summoned one of his friends, a person named Manny who was there that night and spoke Spanish, to help translate. Geerts testified that he did not notice if plaintiff's pants or shirt were wet.

¶ 30    Eventually, plaintiff's friends suggested that plaintiff be taken outside. Geerts explained that plaintiff is "a large man, so it took his two friends" plus Manny to move him outside. Once he was outside, plaintiff called his wife. However, according to Geerts, plaintiff's wife was working, so Geerts asked plaintiff if he needed an ambulance. Plaintiff then called 9-1-1 and requested an ambulance.

¶ 31    Then the police arrived. After a short conversation with the responding officer, Geerts spoke to plaintiff's friends. According to Geerts, he asked them "if they had done anything else," and one of the friends responded that he had consumed eight beers before arriving at Temperance. Geerts then talked to the paramedics and told them, "I think they've had a lot of beer. I found him on the floor with his shoe off. I don't know what happened."

¶ 32    According to Geerts, while all of this was transpiring, plaintiff's friends were attempting to drive away in a car, which Geerts stated he was "not having." Geerts then testified that he saw

"the guy that was dirty dancing, whatever, drive away on a bike." Geerts later learned that the friend stole the bike he rode away on.

¶ 33    On examination by Temperance's attorney, Geerts testified that he did not see any liquid in the bathroom floor or the vestibule area. He answered "no" when asked whether plaintiff "pointed to any body part" or "scream[ed] in pain" when Geert's helped plaintiff off the get up in the vestibule. Geerts then noted that during the incident, plaintiff's friends "were making fun of him, like laughing about kind of, you know. Like, come on. You're drunk, you know."

¶ 34    Upon further examination, Geerts testified that he could not recall the last time he inspected the men's bathroom prior to plaintiff's arrival.

¶ 35                                  4. Michael Van Camp

¶ 36    Mike Van Camp testified that in September 2015, he worked as a bartender at Temperance. One of his duties was to conduct routine checks of the bathrooms every hour. During those checks, Van Camp would look to see if there was water on the bathroom floor. If he observed water, he would mop it up and then place "wet floor" signs outside and inside the bathroom. When asked how often he would have to mop up water on the floor, Van Camp answered, "Maybe once a month. Maybe." In addition, when asked whether he knew about any other slip-and-fall accidents in the bathroom, Van Camp answered, "There has not been."

¶ 37    Van Camp then testified that he did not observe anything out of the ordinary when he checked the men's bathroom during his shift on September 25, 2015. He stated that the last bathroom check he recalled making occurred two hours before plaintiff's fall, but he could not recall how long before the fall the bar manager, Geerts, had last performed a bathroom check.

¶ 38    With regards to plaintiff's fall, Van Camp testified that he saw plaintiff walk to the bathroom and that the next time he saw plaintiff was when a customer said that plaintiff had

fallen. Van Camp went to plaintiff and saw that one of his shoes "was untied and three feet away from his body." Van Camp helped put plaintiff's shoe back on and retrieved a small stool. Plaintiffthen "got himself up" and Van Camp "sat him down on [the] stool" and got plaintiff a glass of water. According to Van Camp, during this time, plaintiff's friends "appeared to be wanting to leave. They were going to leave him behind." Van Camp later explained, "Ben [Geerts] was asking them to stick around and help their friend but they kept trying to leave the bar. One of them then stole a bicycle and left."

¶ 39    According to Van Camp, only "minutes" after he told Geerts about the accident, Van Camp went into the men's bathroom to "make sure that *** there wasn't any water" and that "everything was kosher." Van Camp specifically checked for water on the floor near the sink and found that "there wasn't" any water on the floor. However, Van Camp did state that between the fall and his subsequent check, at least one other person had entered the bathroom.

¶ 40    Van Camp was asked whether he was "aware of any ongoing and repeated problem of water being on the floor when you would go into the bathroom ***?" Van Camp replied, "[n]othing frequently." Thereafter, the following colloquy occurred:

"Q.   Other than that rare occasion when you had to clean something up in the bathroom, there was no ongoing and repeated problem of water being on the floor in the bathroom, true?

A.   True.

                                    ***

Q.   Water doesn't splash out of that sink every time you turn the faucet on, does it?

A.   No.

Q. There's not water on the floor, over the side and onto the floor, was there?

\*\*\*

A. No.

Q. You've used the sink in there?

A. Yes.

Q. You've cleaned the sink?

A. Yes.

Q. You've turned on and rinsed out the sink?

A. Yes.

Q. You know the water doesn't come splashing out of the sink when you turn it on; is that true?

A. Yes.

Q. That's been the same sink the whole time you have been there?

A. Yes."

Thereafter, Van Camp was asked, "prior to being informed by the customer that [plaintiff] had fallen, no one in the bar had come up to you and complained about the bathroom being messy or the floor being wet in the bathroom?" Van Camp replied, "No one had, yes. No one had brought anything up."

¶ 41    On cross-examination by Temperance's attorney, Van Camp testified that Geerts checked the bathroom sometime after Van Camp's last check before plaintiff's fall, but he could not recall how much time passed between Geerts's last check and plaintiff's fall. Van Camp then testified that on the day of the accident, before opening, he did not notice "any issues" with water on the floor in the men's bathroom; before plaintiff's fall, no one told him there was water on the

floor; and from the time when Temperance opened until immediately before plaintiff's fall, he did not observe water on the floor of the men's bathroom.

¶ 42                                    5. Meagan Atkins

¶ 43    Atkins testified that she was working as a bartender at Temperance on the evening of September 25, 2015. Before plaintiff's fall, she did not receive any complaints about the physical condition of the men's bathroom, nor did anyone inform her that water was building up in the men's bathroom.

¶ 44                                    C. Trial Court Ruling

¶ 45    The trial court awarded summary judgment to Temperance on the negligence claim and the derivative consortium claim brought by plaintiff's wife. The court based its ruling on the lack of proof on constructive notice. Based on the case law, the court explained in its oral ruling, "there has to be some evidence put forward by the plaintiff regarding some time factor" regarding the length of time the wet substance was on the floor, and "I can't say that the plaintiff or any evidence that he's produced gives me any ability to hang my hat on any amount of time to say, first of all, what it was, but specifically when it was there ***."

¶ 46                                    D. Motion to Reconsider

¶ 47    Plaintiff moved for reconsideration. In that motion, plaintiff argued that Temperance had constructive knowledge that there was a wet substance on the bathroom floor "because water dripping or splashing on the floor of the men's bathroom was a recurring incidence of which Temperance had actual knowledge."

¶ 48    Temperance's principal response was that plaintiff's motion was improper, because the recurring-dangerous-condition argument advanced in the motion to reconsider was being raised

for the first time. Alternatively, Temperance argued that summary judgment was proper, even taking into account plaintiff's recurring-incidence theory.

¶ 49    At the hearing on the motion to reconsider, plaintiff's attorney did not dispute that the motion to reconsider raised a new legal theory. Rather, his attorney admonished the court that it could exercise its discretion to consider a newly raised argument and then maintained that "[i]t's not like we're bringing in new evidence, it's a different—it's an argument based on the record we have, the testimony we have, and it's just a little broader on the law ***."

¶ 50    In response, the court stated:

"[W]hen I go down through the motion for reconsideration, *** there are a set of facts that are alleged and specified in here in your first several pages, but once we get to page 5 ***, now we're getting into this whole area here where Temperance knew water splashed from the sink, its bartender observed water on the floor, we get into the towel dispensers on the wall to the left of the entrance of the bathroom ***. That—I wrote that whole column to the right, this is a new theory, it's new arguments, it's a new theory, it's not newly found evidence but it's not anywhere in *** the response to the motion for summary judgment. And if you continue onto the next page, those facts to set this up, if Geerts had seen puddles of water underneath the dispenser while inspecting that, he would—it's all the stuff that might have been in a deposition but was never advanced, it was never argued, it was not the theory. The theory has changed. The argument has changed. It's a new twist to it. And that continues really throughout page after page after page until I get to the brand new cases, the four cases starting with Perminas vs. Montgomery Ward, Nicholas [sic] versus St. Anne's, that—St. Anne's Lanes, the Cully

15

[sic] case. Again, this is like I'm seeing a whole new twist, a whole new motion that I've
never seen before."

Thereafter, the following colloquy occurred between the court and plaintiff's attorney:

"MR. LUNDBLAD: First of all, under the testimony and evidence that was cited
to in the motion to reconsider, it was all part of the record at the time of the summary
judgment hearing. It's not like we've gone out and found new witnesses or brought in
new testimony. All of the testimony that was cited to. Van Camp, Geerts, Gilbert,
plaintiff, it was all in front of the Court at the last hearing.

THE COURT: Well, it is, but let's make sure we know, so I bring out a stack now
of about a foot of papers and documents and transcripts, but to take your argument today
and what you're arguing now would really require, Judge, it's your fault then, it's your
fault that you didn't come up with the arguments that we decided to make at the motion
to reconsider, you didn't create that on your own for us when you went through those
transcripts. We didn't bother to do it. Most courts would look at that failure to argument
[*sic*] those points and those theories as a waiver. And I think it's a waiver. So for—to put
it on the Court that the Court erred at this point, I've got to be honest, my comments are a
busy trial court has way too many motions that I can create arguments for the parties if
they don't make them themselves."

¶ 51    At the conclusion of the hearing, the court denied plaintiff's motion to reconsider. This
timely appeal followed.

¶ 52                                    ANALYSIS

¶ 53    On appeal, plaintiff argues that the court erred by (1) denying his motion to reconsider
and (2) entering summary judgment in favor of Temperance.

¶ 54                                                    I. Summary Judgment

¶ 55      We first consider whether the circuit court erred by granting summary judgment to

Temperance. Summary judgment is proper if "the pleadings, depositions, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West

2018). We construe these materials strictly against the movant and liberally in favor of the non-

movant. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. We review an order of summary

judgment *de novo*. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22.

¶ 56      To sustain a claim in negligence, plaintiff must plead and prove the existence of a duty, a

breach of that duty, and damages proximately resulting from the breach of that duty. *Bruns v.

City of Centralia*, 2014 IL 116998, ¶ 12. There is no dispute that property owners owe a duty to

maintain their property in a reasonably safe condition. *Milevski v. Ingalls Memorial Hospital*,

2018 IL App (1st) 172898, ¶ 29. The question here is whether plaintiff can prove that

Temperance breached that duty, or if plaintiff has at least created a triable issue of fact on that

element of his claim sufficient to avoid summary judgment.

¶ 57      In *Olinger v. Great Atlantic & Pacific Tea Co.*, 21 Ill. 2d 469 (1961), our supreme court

outlined the contours of a business's liability to a business invitee injured by slipping on a

substance on the premises. The court explained:

    "Where a business invitee is injured by slipping on a foreign substance on the premises,

    liability may be imposed if the substance was placed there by the negligence of the

    proprietor or his servants, or, if the substance was on the premises through acts of third

    persons or there is no showing how it got there, liability may be imposed if it appears that

    the proprietor or his servant knew of its presence, or that the substance was there a

sufficient length of time so that in the exercise of ordinary care its presence should have been discovered." *Id*. at 474.

¶ 58    Plaintiff does not claim, nor does the evidence show, that Temperance created the alleged wet substance on the bathroom floor or that Temperance had actual knowledge of the alleged wet surface. So as the parties agree, this case comes down to constructive notice—whether Temperance, in the exercise of ordinary care, should have known of the wet surface on the bathroom floor and thus corrected it before plaintiff slipped and fell.

¶ 59    Establishing a period of time is critical to showing a defendant's constructive notice of an allegedly dangerous condition. See, *e.g.*, *Ishoo v. General Growth Properties, Inc.*, 2012 IL App (1st) 110919, ¶ 28 ("Constructive notice can only be shown where the dangerous condition is shown to exist for a sufficient length of time to impute knowledge of its existence to the defendants."); *Hayes v. Bailey*, 80 Ill. App. 3d 1027, 1030 (1980) ("the time element to establish constructive notice is a material factor [citation] and it is incumbent upon the plaintiff to establish that the foreign substance was on the floor long enough to constitute constructive notice to the proprietor."); *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 650–51 (7th Cir. 2014) (under Illinois law of constructive knowledge, length of time that allegedly hazardous substance existed before plaintiff's injury is "of critical importance" (internal quotation marks omitted)).

¶ 60    For example, in *Hayes*, 80 Ill. App. 3d at 1031, we affirmed a directed verdict for the defendant in a case like this one, where the plaintiff slipped on a puddle of water in a restaurant bathroom. We reasoned that

>    "there is no evidence at all as to how long the water had been on the floor of the restroom. Plaintiff simply testified that she slipped and fell and that after she was on the floor she noticed she was wet. In the absence of any evidence tending to show

18

constructive notice we believe it was proper to not submit the case to the jury and to direct a verdict for the defendant." *Id*. at 1030.

¶ 61    We reached a similar result in *Tomczak v. Planetsphere, Inc.*, 315 Ill. App. 3d 1033 (2000). There, the plaintiff went to a roller-skating rink with a friend and witnessed a "male skater" slip and "almost" fall on "what appeared to be water on the rink floor." *Id*. at 1035. Thereafter, a rink employee went onto the rink floor with towels and "wiped up the puddle of water, which was approximately 18 inches in diameter." *Id*. Afterwards, the plaintiff resumed skating and, after taking a few turns around the rink skating backwards, slipped and fell, fracturing her elbow. *Id*.

¶ 62    At her deposition, the plaintiff testified that she fell in the same area that the male skater had fallen, and that she noticed water near where she fell. *Id*. She was asked, "Would it be fair to say that that puddle could have been there anywhere from ten seconds to ten minutes, you just don't know?" She replied, "I don't know that." The circuit court ultimately granted summary judgment to Planetsphere. We affirmed, finding summary judgment appropriate, among other reasons, for failure to show constructive notice. There was insufficient evidence of constructive notice, we held, because "by plaintiff's own admission, the water was present an unknown period of time." *Id*. at 1040.

¶ 63    Our decision in *Ishoo v. General Growth Properties, Inc.*, 2012 IL App (1st) 110919, was cut from the same cloth. There, the plaintiff slipped on a substance she believed to be Windex and sued the mall owner. *Id*. ¶ 16. Responding to a motion for summary judgment, she swore in an affidavit: " 'I cannot state exactly when or how the Windex came to be on the floor, but I can absolutely state with certainty that it was Windex or a similar cleaner or water mixed with a cleaning solution that caused me to fall.' " *Id*. We affirmed summary judgment on the issue of

constructive notice, as "there are no facts that show the length of time the liquid substance was on the floor. While the plaintiff claims that the liquid substance was 'squeegeed' onto the floor between 3 p.m. and 3:30 p.m., nothing in the record supports that claim. Constructive notice cannot be shown on the record before us." *Id.* ¶ 28.

¶ 64    Here, plaintiff's best evidence about the length of time the water was on the bathroom floor came from Van Camp and Geerts, but their testimony offered little in the way of hard evidence. Van Camp testified that he inspected the men's bathroom two hours before plaintiff's fall, and he also recalled that Geerts inspected the bathroom sometime thereafter but also before the fall. Geerts, for his part, testified that he simply could not recall the last time he checked the bathroom that night, but that he tried to stick to a policy of checking them every thirty minutes during busy nights like the one in question.

¶ 65    Plaintiff points to Van Camp's testimony that he observed drips of water on the floor near the bathroom sink as frequently as "maybe" once a month. He also cites the testimony of Gilbert and Geerts to the effect that each had observed drops of water by the towel dispenser. The problem, however, is that this general evidence says nothing about the night in question.

¶ 66    For one thing, as the trial court briefly noted, nobody testified that the substance on the floor was water. Plaintiff, by far the person in the best position to do so, could not identify the substance as water, despite prompting at his deposition. Nor did anybody testify that they saw water on the bathroom floor before, during, or after plaintiff's visit to the bathroom (Van Camp said that he checked after the fall and did not see any; Geerts said he didn't notice any while plaintiff was urinating; they both said they saw no water beforehand). Plaintiff criticizes the trial court in this regard for adopting the possibility that plaintiff had urinated on himself or the

floor—that the wet substance was urine—but the point the trial court was making was that it could not even say for certain that the substance was water.

¶ 67　But more importantly in our eyes (and in the trial court's, based on its comments), even if plaintiff were entitled to the inference that the wet substance on the floor was water from the sink, there is no evidence as to how long that water was on the floor before plaintiff's slip and fall. There is simply no evidence to tell us whether the alleged wet substance was on that floor for thirty seconds, two minutes, thirty minutes, or two hours. And while an elapsed time of two hours might be enough for a reasonable inspection to discover the substance—and thereby establish constructive notice—a handful of seconds obviously would not. A jury or judge at trial would be able to do nothing more than guess at how long that substance was present in the restroom.

¶ 68　Summary judgment " 'is the put up or shut up moment in a lawsuit.' " *North Community Bank v. 17011 South Park Avenue, LLC*, 2015 IL App (1st) 133672, ¶ 15 (quoting *Parkway Bank & Trust Co. v. Korzen,* 2013 IL App (1st) 130380, ¶ 14). To "put up," the party opposing summary judgment ordinarily must produce actual evidentiary facts that would enable a jury to return a favorable verdict—and "mere speculation, conjecture, or guess" is insufficient. *Barrett v. FA Group, LLC*, 2017 IL App (1st) 170168, ¶ 26 (quoting *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999)).

¶ 69　So while we draw all reasonable inferences in plaintiff's favor at the summary-judgment stage, we can only draw favorable inferences from evidentiary *facts*, and here we lack any concrete factual information. Summary judgment in favor of Temperance was thus proper.

¶ 70　Plaintiff argues, however, that Temperance owed a legal duty to inspect the bathroom every half-hour, based on the deposition testimony of Geerts that he had an unofficial *personal*

policy of inspecting the bathroom ever 30 minutes when Temperance was busy, as it was that evening.

¶ 71    We cannot agree that an internal rule or policy, official or otherwise, creates a legally binding duty, independent of the common law.  To be sure, the existence of an internal rule or policy could be a relevant factor in determining the existence of a common-law duty. For example, in considering whether a common-law duty existed for a fraternity house to protect pledges from hazing, in weighing the factors that go into determining the existence of a duty— including the magnitude of the burden placed on the fraternity and the consequences of placing that burden on the fraternity—our supreme court found it relevant that both the university and the fraternity had internal rules forbidding hazing, and thus there could be "no real burden" to require the fraternity to protect students from hazing when it was already required to do so by its own bylaws and those of the university. *Bogenberger v. Pi Kappa Alpha Corp., Inc.*, 2018 IL 120951, ¶ 46.

¶ 72    It is far different, however, to convert that internal rule into a legally binding duty of its own. As our supreme court recently noted:

> " '[W]here the law does not impose a duty, one will not generally be created by a
>
> defendant's rules or internal guidelines. Rather, it is the law which, in the end, must say
>
> what is legally required.' [Citation.] Self-imposed policies can exist coextensively with
>
> the law. [Citation.] Penalizing a defendant by imposing a duty on it to comply with self-
>
> imposed safety measures that exceed any duty imposed by law, however, would
>
> discourage employers from creating policies intended to protect their employees and the
>
> public. We decline to do so. Neither [defendant's] Policy nor any other policy or

procedure created or adopted by [co-defendant] creates any duty beyond that already imposed by the law." *Doe v. Coe*, 2019 IL 123521, ¶ 36.

¶ 73 That is so, our supreme court has explained, because "[w]hether a legal duty exists is a question of law and is determined by reference to whether the parties stood in such a relationship to each other that *the law* imposes an obligation on one to act for the protection of the other." (Emphasis in original.) *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996). See *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 168 ("Howe's purported internal policy by itself of requiring a driver who had been involved in a preventable accident to complete a safety course prior to receiving another dispatch did not establish a standard of care that, if breached, constituted negligence."); *Zuppardi*, 770 F.3d at 652 (applying Illinois law) ("Although Wal–Mart's internal policy requires employees to continuously monitor the [high-traffic aisles where plaintiff was injured], this goes above and beyond the duties required of businesses by Illinois courts and does not create a new legal standard of ordinary care requiring the same.").

¶ 74 Our supreme court in *Rhodes* favorably cited several appellate decisions for this long-recognized proposition. See *Blankenship v. Peoria Park District,* 269 Ill. App. 3d 416, 422 (1994) (park district's internal rules requiring one lifeguard to remain on duty at all times did not create legal duty to have one lifeguard on duty); *Fillpot v. Midway Airlines, Inc.,* 261 Ill. App. 3d 237, 244 (1994) (where airline owed no legal duty to remove snow or ice, airline's policy manual requiring clearing of walkways did not create such duty); *Mattice v. Goodman,* 173 Ill. App. 3d 236, 240 (1988) (where building owners owed no legal duty to assist elderly person through door, no such duty was created by building owner's employment of employee who, in accordance with his job description, customarily assisted elderly persons through door).

¶ 75 Indeed, as our supreme court noted in *Doe*, 2019 IL 123521, ¶ 36, converting those self-imposed regulations into a freestanding duty could have the perverse effect of punishing a company for trying to be safe and thus discourage it from self-regulation. See also *Frye v. CSX Transportation, Inc.*, 933 F.3d 591, 602 (6th Cir. 2019) ("[I]f internal policies could serve as a basis for a legal duty, defendants might well avoid implementing such policies for fear of creating liability where none would otherwise exist."); *Buczkowski v. McKay*, 490 N.W.2d 330, 332 n.1 (Mich. App. Ct. 1992) ("Imposition of a legal duty on a retailer on the basis of its internal policies is actually contrary to public policy. Such a rule would encourage retailers to abandon all policies enacted for the protection of others in an effort to avoid future liability.").

¶ 76 (We should emphasize here that we are not talking about a duty based on a voluntary undertaking, and nothing we have said should foreclose the possibility that an internal policy, *communicated* to customers and *relied upon* by them, could create a duty based on a voluntary undertaking. But a voluntary undertaking is a duty separate and distinct from a duty imposed by the common law. See, *e.g.*, *Bell v. Hutsell*, 2011 IL 110724, ¶ 17; *Mickens v. CPS Chicago Parking, LLC*, 2019 IL App (1st) 180156, ¶¶ 90-93. And it is not one that was pleaded here.)

¶ 77 We thus categorically reject the proposition that an employee's unofficial inspection policy (or even the company's official one) could impose a duty of care on that company independent of the common law. And to the extent we suggested otherwise in a brief passage in *Newsom-Bogan v. Wendy's Old-Fashioned Hamburgers of New York, Inc.*, 2011 IL App (1st) 092860, ¶ 19 ("Defendant's written manual is sufficient to create a duty to inspect every 15 minutes"), we must respectfully disagree with *Newsom-Bogan* to that limited extent.

¶ 78 Plaintiff's reliance on *Newsom-Bogan* is factually distinguishable, in any event. There, the plaintiff went into a Wendy's restaurant, ordered food, and sat down to eat. *Id.* ¶ 5. After

finishing, she stood up to leave, and as she did so, her footing transitioned from a carpeted area to a tile floor, where she slipped on a spot of grease. *Id*. The evidence showed that plaintiff spent twenty minutes eating her food in the restaurant, that she could observe the area on which she later fell the entire time, and that at no time during those twenty minutes did she see any employee do a walk-through or any customer spill anything. *Id*. ¶ 9. In other words, the evidence showed that the grease had existed on the floor for at least twenty minutes. Thus, summary judgment on the issue of constructive notice was inappropriate. A jury would not be required to guess at how long the slippery condition existed; it existed for at least twenty minutes, and a jury could decide whether that was enough time to constitute reasonable notice.

¶ 79     Here, in contrast, nothing fixes the amount of time the alleged slippery condition existed in Temperance's bathroom—not to twenty minutes, not to twenty seconds, not to any amount of time whatsoever. A factfinder would be able to do nothing more than guess at the length of time.

¶ 80     For these reasons, the grant of summary judgment in favor of Temperance on the negligence claim was proper. Summary judgment for Temperance on the consortium claim brought by plaintiff's wife was thus proper as well, as the consortium claim derived from and depended on plaintiff's negligence claim. See *Ramirez v. City of Chicago*, 2019 IL App (1st) 180841, ¶ 20 ("While loss of consortium is a separate cause of action from the impaired spouse's claim, it derives from that claim. [Citation.] When the impaired spouse's claim fails as a matter of law, the deprived spouse's claim for loss of consortium must also fail.").

¶ 81                                  II. Motion to reconsider

¶ 82     We next consider whether the circuit court erred by denying plaintiff's motion to reconsider. In that motion, plaintiff argued that the facts were sufficient to raise a genuine issue of material fact as to constructive notice on the basis that the standing water on Temperance's

bathroom floor was a "recurring dangerous condition." See *Zuppardi*, 770 F.3d at 651 (under Illinois law, constructive notice can also be established through evidence that "the dangerous condition was part of a pattern of conduct or a recurring incident"). The trial court denied the motion on the basis that plaintiff was raising an improper, entirely new legal theory for the first time in the motion to reconsider.

¶ 83 The purpose of a motion to reconsider is to bring to the court's attention one of three things: "newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. But "[a]rguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal." *Id*.

¶ 84 Here, a simple side-by-side comparison of plaintiff's motion to reconsider and his opposition to Temperance's motion for summary judgment shows that plaintiff did not raise the recurring-dangerous-condition argument in his opposition brief. Consider first the opposition brief itself. There, plaintiff advanced two primary arguments—first, that the evidence supported an inference that Temperance was responsible for the alleged water on the bathroom floor because water was "related to the operation" of Temperance's business; and second, that Temperance had constructive notice because "the record indicates that the liquid was likely on the floor long enough that it should have been discovered in the exercise of reasonable care." Neither of those arguments remotely embraced the recurring-dangerous-condition theory proposed in plaintiff's motion to reconsider.

¶ 85 Consider next the motion to reconsider. The portion of the motion in which plaintiff put forth the recurring-dangerous-condition argument cited *Culli v. Marathon Petroleum Co.*, 862 F. 2d 119 (7th Cir. 1988), *Perminas v. Montgomery Ward & Co.*, 16 Ill. App. 3d 445 (1973), and

*Nicholas v. St. Anne Lanes, Inc.*, 136 Ill. App. 3d 664 (1985)—cases which, by plaintiff's own admission, he cited for the first time in his motion to reconsider. The court's comments that the motion to reconsider read like a "whole new motion" was thus spot-on. There is no doubt that the recurring-dangerous-condition argument was raised for the first time in the motion to reconsider.

¶ 86    As this legal theory was raised for the first time in a motion to reconsider, the argument is forfeited on appeal. *Riseborough*, 2014 IL 114271, ¶ 36; see *Caywood v. Gossett*, 382 Ill. App. 3d 124, 134 (2008) ("[A]rguments raised for the first time in a motion for reconsideration in the circuit court are waived on appeal. [Citation]. Because plaintiff failed to raise this argument in her response to defendants' motion to dismiss, she waived her right to assert this issue.").

¶ 87    Nor, in any event, could we find that the trial court abused its discretion by refusing to consider the new legal theory. An abuse of discretion occurs when the circuit court's decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. Given the improper nature of plaintiff's motion, the trial court acted on solid ground. See *Holzer v. Motorola Lighting, Inc.*, 295 Ill. App. 3d 963, 978 (1998) ("[I]t is well-settled that one may not raise a legal theory for the first time in a motion to reconsider."). We cannot say that no reasonable jurist would have done what the circuit court did here in rejecting out-of-hand plaintiff's belated recurring-dangerous-condition argument.

¶ 88    We thus affirm the denial of the motion for reconsideration.

¶ 89                                    CONCLUSION

¶ 90    The judgment of the circuit court is affirmed.

¶ 91    Affirmed.

27

**No. 1-19-0606**

| | |
|---|---|
| **Cite as:** | *Tafoya-Cruz v. Temperance Beer Co.*, 2020 IL App (1st) 190606 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-62019; the Hon. Jeffrey L. Warnick, Judge, presiding. |
| **Attorneys for Appellant:** | Milo W. Lundblad, of Brustin & Lundblad, Ltd., Chicago, for appellants. |
| **Attorneys for Appellee:** | Mollie E. Werwas, Amanda J. Walsh, and Julie A. Black, of Kopon Airdo, LLC, of Chicago, for appellee. |